**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CASE NO. 5:11-CV-000128**

**RICHARD WARD BRYANT,**
**individually on behalf of the**
**estate of KIRA BRYANT**                                                          **PLAINTIFF**

**v.**

**JAMISON K. TURNEY,**
**DEDRA K. TURNEY, and**
**PADUCAH NISSAN, LLC,**
**d/b/a NISSAN OF PADUCAH**                                              **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on a number of dispositive motions. Defendant Paducah Nissan, LLC, first moved for summary judgment. (Def.'s Mot., Docket Number ("DN") 64.) Plaintiff Richard Bryant responded. (Pl.'s Resp., DN 70.) In the interim, Bryant filed an amended complaint adding, or at least clarifying, his claim for negligent entrustment against Paducah Nissan. (Am. Compl., DN 79.) He then moved for summary judgment on all claims. (Pl.'s Mot., DN 68.) Paducah Nissan responded. (Def.'s Resp., DN 84.) Bryant replied. (Pl.'s Reply, DN 88.) Paducah Nissan also moved for summary judgment on the amended complaint. (Def.'s Mot., DN 89.) Bryant responded. (Pl.'s Resp., DN 90). Paducah Nissan replied. (Def.'s Reply, DN 93.) Fully briefed, the motions are now ripe for adjudication. For all of the following reasons, the parties' motions are **DENIED**.

**I.**

On June 13, 2011, 14-year-old Kira Bryant ("Kira") was severely injured in a motorcycle accident in Paducah, Kentucky. At the time of the accident, Kira was a passenger on a motorcycle driven by her stepfather, and defendant in this action, Jamison Turney ("Jamison").

Tragically, Kira succumbed to her injuries and died the day after the accident.  Plaintiff Richard Bryant ("Bryant"), Kira's biological father, instituted this wrongful death action against Jamison, Kira's mother, Dedra Turney ("Dedra"), and Paducah Nissan, LLC ("Paducah Nissan").  For a discussion of the procedural background of this action, including the Court's decision to allow Bryant to maintain his claims in this Court despite a similar action brought by Dedra in state court, see *Bryant v. Turney*, No. 5:11-CV-00128-TBR, 2012 WL 4471589, at *1 (W.D. Ky. Sept. 26, 2012).

Blood and urine tests administered to Jamison after the accident revealed that his blood alcohol content exceeded Kentucky's legal limit, indicating that he was intoxicated at the time of the accident.  (Laboratory Report, DN 68-10.)  As a result, criminal charges were brought against Jamison in state court for Kira's death.   (Uniform Citation, DN 68-11.)   Although Jamison initially pleaded not guilty to Kira's wanton murder, he subsequently admitted guilt to the lesser offense of second degree manslaughter.  (Mot. to Enter Guilty Plea, DN 68-2; Order & J. on Plea of Guilty, DN 68-3.)  He is currently serving a prison term as part of his plea agreement.

Jamison did not own the motorcycle involved in the accident.  It was owned by his employer and co-defendant, Paducah Nissan.  (Paducah Nissan's Resps. to Reqs. for Admiss., DN 68-15, p. 2.)  Richard Kelley ("Kelley"), Kira's grandfather and Jamison's father-in-law, is the majority owner of Paducah Nissan.  At all times pertinent to this action, Jamison was employed as the business's general manager.  Because Kelley was often out of state, he granted Jamison substantial authority over Paducah Nissan's daily operations, including control over the dealership's inventory.  (Dep. Richard Kelley, DN 68-12, pp. 24:8-25:18, 60:17-24.)  As part of inventory control, Jamison was authorized to allow Paducah Nissan employees, including himself, to drive certain vehicles home over night.  (*Id.* at p. 25:6-13; Dep. Jamison Turney, DN

84-2, pp. 110:17-111:7.)

Paducah Nissan did not sell motorcycles at retail.  It did, however, accept them for trade-in value toward vehicle purchases.  (Dep. Richard Kelley, DN 68-12, p. 36:2-17.)  If Paducah Nissan accepted a motorcycle as part of a trade, the company's unwritten policy was to sell or trade the vehicle within 24 hours.  (*Id.* at p. 36:2-11.)  Although the record is unclear as to whether it was acquired as part of a trade or through outright purchase, Paducah Nissan obtained the motorcycle at issue on July 29, 2010.  (Dep. Richard Kelley, DN 84-3, pp. 41:20-42:11.) Jamison was responsible for the acquisition and instructed Paducah Nissan employees to title the motorcycle in the business's name.  (Dep. Jamison Turney, DN 84-2, p. 29:8-25.)  Even though the motorcycle was owned by Paducah Nissan, the record reveals that Jamison exercised exclusive control over it.  He was the only employee that rode it.  (Dep. Jamison Turney, DN 68-5, p. 63:17-19.)  When not riding it, the motorcycle was stored at Jamison's house.  (*Id.* at p. 63:20-64:1.)  Jamison described it as "his bike" during his deposition and agreed to it being called his "prize[d] possession."  (Dep. Jamison Turney, DN 84-2, p. 127:4-9.)

Although Paducah Nissan's policy was to immediately sell all motorcycles in inventory, Jamison did not abide by that policy.  After acquiring it in July of 2010, Jamison rode the motorcycle periodically until September of that year.  (Dep. Jamison Turney, DN 68-5, p. 64:16-18.)  After the winter months, he resumed riding it in March of 2011 until the date of the accident.  (*Id.* at pp. 64:19-65:5.)  Although he rode the motorcycle multiple times a week, Jamison only rode it to the dealership on Saturdays.  (*Id.* at p. 65:6-10.)  Richard Kelley never saw Jamison ride the motorcycle in 2010, and only learned in March of 2011 that it was in Paducah Nissan's inventory and that Jamie rode it frequently.  (*Id.* at p. 65:14-19; Dep. Richard Kelley, DN 84-3, p. 43:2-14.)  Jamison admits that he did not tell Kelley about the motorcycle

3

prior to March of 2011.  (Dep. Jamison Turney, DN 84-2, p. 31:5-9.)  As Jamison acknowledged in his deposition, if, at any point, Kelley learned that the motorcycle was in inventory it would either have to be sold or Jamison would have to buy it for himself.  (*Id.* at p. 111:8-22.)

Kelley instructed Jamison to sell the motorcycle after learning that it was in Paducah Nissan's inventory.  (*Id.* at p. 31:8-9; Dep. Richard Kelley, DN 84-3, pp. 43:3-44:2.)  Rather than sell it to a third party, Jamison told Kelley that he would buy the motorcycle.  (Dep. Jamison Turney, DN 84-2, pp. 31:18-32:6; Dep. Richard Kelley, DN 84-3, pp. 43:20-44:2.)  Despite agreeing to buy it, and although he went so far as to complete some initial paper work, Jamison never actually purchased the motorcycle from Paducah Nissan.  Due to his wife's health issues, Kelley remained in Florida and never followed up on Jamison's promise to purchase the motorcycle.  (Dep. Richard Kelley, DN 84-3, pp. 44:5-45:25.)  It is undisputed that Jamison never took title to the motorcycle and that it was owned by Paducah Nissan at the time of Kira's death.

Because alcohol was involved in the accident, the parties thoroughly investigated Jamison drinking habits.  Jamison admitted to consuming alcohol at his home approximately 30 minutes before the wreck.  (Dep. Jamison Turney, DN 68-5, pp. 57:14-58:3.)  But he denied drinking alcohol on the job at Paducah Nissan during May and June of 2011.  (*Id.* at p. 55:7-9.)  Testimony in the record is mixed as to whether Jamison ever drank on the job or would drive Paducah Nissan's vehicles after consuming alcohol.  Paducah Nissan's owners, Richard Kelly and James Meade had no knowledge as to whether Jamison would drink at the dealership or drive dealership vehicles after drinking.  (Dep. Richard Kelley, DN 84-3, p. 48:5-25; Pl.'s Mot, DN 89-1, p. 9 (quoting Dep. James Meade, p. 39:9-24).)  Kelley observed Jamison consuming alcohol on social occasions but never on the job.  (Dep. Richard Kelley, DN 84-3, pp. 47:19-

48:4).   John Day, a former salesman at Paducah Nissan, never saw Jamison drink at the dealership during work hours, but in May of 2010 he did drink beer with Jamison on the premises after hours.  (Dep. John Day, DN 84-4, p. 13:4-17.)  Steven Lance, another employee, only saw Jamison drink on the business premises twice in the three years he worked at Paducah Nissan, but both occasions were after hours.  (Dep. Steve Lance, DN 84-5, p. 13:19-23.)  John Day also testified that Jamison would frequently drink a pint of alcohol in the three months prior to the accident.  (Dep. John Day, DN 68-7, p. 42:16-19.)  David Phillips, another salesman, never saw Jamison intoxicated at work and never saw him drink alcohol.  (Dep. David Phillips, DN 84-6, pp. 12:20-13:4.)  Phillips did, however, buy alcohol for Jamison three times during work hours at a liquor store across the street from Paducah Nissan.  (Dep. David Phillips, DN 68-8, p. 11:11-15.)  Phillips drove Jamison's truck to the store and used Jamison's credit card to make the purchases.  (*Id.* at p. 11:21-25.)  He bought alcohol for Jamison approximately one week before Kira's death.  (*Id.* at p. 11:5-10.)  Jamison admitted that he asked Paducah Nissan employees to purchase alcohol for him on occasion.  (Dep. Jamison Turney, DN 68-5, p. 35:18-23.)

Mike Allen, a former sales manager at Paducah Nissan, testified at length about Jamison's drinking habits.  He believed that Jamison had a drinking problem.  (Dep. Mike Allen, DN 68-6, p. 49:11.)  In March of 2011 he often saw Jamison send employees to the liquor store for a pint of vodka.  (*Id.* at p. 51:9-14.)  In the beginning Jamison sent employees once a week, but "it just kept getting worse and worse."  (*Id.* at p. 51:17-18.)  When Allen confronted Jamison about his drinking, Jamison represented that he was purchasing the alcohol for consumption at home.  (*Id.* at p. 51:22-23.)  In April and May of 2011, Jamison's habit progressed to where he sent salesmen to the liquor store twice a day.  (*Id.* at pp. 51:24-52:2.)  Furthermore, Allen testified that Jamison began drinking on the job during May.  (*Id.* at pp. 52:18-53:13.)  Allen

personally observed Jamison drinking in Richard Kelley's office at Paducah Nissan.  (*Id.* at p. 53:13-15.)  According to Allen, Jamison was out of control and needed help for his drinking by June of 2011.  (*Id.* at p. 84:3-6.)  Despite his knowledge of Jamison's alcohol use, Allen did not act to curtail his drinking.  He gave two reasons for this.  First, Jamison was his supervisor.  (*Id.* at p. 72:20.)  Second, Allen would have reported the problems to Richard Kelley, Jamison's father-in-law, and Allen was concerned about causing family problems or losing his job.  (*Id.* at pp. 72:23-73:1.)  At one point Allen tried to contact Paducah Nissan's minority owner, Jim Meade, but did not talk to him about these events until after Kira's death.  (*Id.* at p. 73:6-11.)

The events leading up to the accident on June 13, 2011, were also subject to substantial discovery.  On the morning of Friday, June 10, 2011, Jamison and salesman John Day loaded the motorcycle onto a trailer at Paducah Nissan in anticipation of a weekend trip that Jamison and his family were taking to Nashville.  (Dep. John Day, DN 84-4, pp. 38:18-39:5.)  Steve Lance testified that he saw Jamison at the dealership on Saturday, June 11, 2011, but that Jamison was wearing civilian clothes, was not on duty, and was not working on that day.  (Dep. Steve Lance, DN 84-5, p. 39:3-10.)  Mike Allen testified that Jamison left Paducah Nissan around 2 p.m. on Friday, June 10, and was not at the dealership on the following Saturday, Sunday, or Monday.  (Dep. Mike Allen, DN 84-1, p. 152:7-19.)  Regardless of whether he left Friday or Saturday, Jamison traveled with his family and the motorcycle to Nashville over the weekend of June 10 for the purpose of participating in a charity motorcycle ride sponsored by Richard Kelley's son and Jamison's brother-in-law.  (*Id.* at p. 153:1-11; Dep. Dedra Turney, DN 84-8, p. 67:3-10.)

The family remained in Nashville over the weekend and traveled back to Paducah during the afternoon of Monday, June 13, 2011.  (Dep. Debra Turney, DN 84-8, pp. 78:20-79:2.)  Jamison did not work at Paducah Nissan on that Monday because the family did not return to

Paducah until the late afternoon.  (Dep. Richard Kelley, DN 84-3, pp. 58:20-59:10.)  Upon returning home, Dedra unpacked suitcases, washed dishes and clothes, and performed other household chores.  (Dep. Dedra Turney, DN 68-4, p. 87:2-8.)  During this time, Jamison asked RJ, his stepson, to buy some gin.  (Dep. *Id.* at pp. 85:22-86:11.)  Jamison consumed two gin drinks before going on the motorcycle ride with Kira.  (Dep. Jamison Turney, DN 68-5, p. 57:17-25.)

The record reflects differing reasons for the motorcycle ride.  According to Jamison, he and Kira rode to the local Harley-Davidson store to look at motorcycles at Kira's request.  (*Id.* at p. 73:13-16.)  Apparently Kira no longer liked the motorcycle Jamison normally rode and wanted Jamison to replace it with a yellow one.  (*Id.*)  After the accident, Dedra gave a different reason for the ride.  According to Dedra, Jamison and Kira drove to the Harley-Davidson store because Jamison planned to upgrade the motor on the motorcycle and Kira "wanted to go look at motors that night.  So they were going to the Harley store to look at motors."  (Aff. Jonathan Hampton, DN 68-13.)

Based on the foregoing facts and others detailed below, Richard Bryant contends that Paducah Nissan bears liability for Kira's death under two distinct legal theories.  First, he alleges that Paducah Nissan negligently entrusted the motorcycle to Jamison.  Second, he claims that Paducah Nissan is responsible for Jamison's actions because he was acting within the scope of employment on the night of the accident.

## II.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve

all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

While the substantive law of Kentucky is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the standards of Federal Rule of Civil Procedure 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993) (abrogated on other grounds in *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010)).

Finally, "[t]he standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus, Ohio,* 636 F.3d 245, 249 (6th Cir. 2011) (citation omitted).

## III.

Kentucky has long recognized that the tort of negligent entrustment encompasses the use of motor vehicles. *See Owensboro Undertaking & Livery Ass'n v. Henderson*, 115 S.W.2d 563, 564 (Ky. 1938); *Brady v. B & B Ice Co.*, 45 S.W.2d 1051, 1052 (Ky. 1932). Pursuant to this tort, "one who entrusts her vehicle to another whom she knows to be inexperienced, careless, or reckless, or given to excessive use of intoxicating liquor while driving, is liable for the natural and probable consequences of the entrustment." *Cox v. Waits*, Nos. 2002-CA-002357-MR, 2002-CA-002418-MR, 2004 WL 4055811, *2 (Ky. Ct. App. Mar. 5, 2004). "The owner is liable if he knows, or under the facts known to him in the exercise of ordinary care should know, that the person driving the car is incompetent to drive it." *Henderson*, 115 S.W.2d at 564.

Richard Bryant and Paducah Nissan both move for summary judgment on the negligent entrustment claim. Bryant argues that Paducah Nissan negligently entrusted the motorcycle to Jamison in one of two ways. First, pursuant to a novel theory previously recognized outside of Kentucky, Bryant claims that Jamison, acting within his authority as general manager and being aware of the incompetency caused by his escalating alcohol abuse, negligently entrusted the motorcycle to himself. In other words, Jamison, as general manager, negligently entrusted the motorcycle to an individual – himself – that he knew to be incapable of safely operating the vehicle because of a pattern of substance abuse. Second, even if Jamison could not negligently entrust the motorcycle to himself, Bryant argues that Richard Kelley, Paducah Nissan's majority owner, negligently entrusted the motorcycle to Jamison because he knew that Jamison was inexperienced with and incapable of safely operating the motorcycle. With regard to the first theory, the Court finds that Jamison's knowledge of his own incompetence cannot, as a matter of law, be imputed to Paducah Nissan. As to the second theory, the Court finds that a genuine

dispute of material fact exists as to whether Richard Kelley knew that Jamison was incompetent to operate the motorcycle because of inexperience.

**a.**

Bryant first seeks summary judgment on the theory that Jamison, acting within authority granted to him by Paducah Nissan, negligently entrusted himself with the motorcycle at issue. Bryant readily admits that Kentucky law is silent on this approach to negligent entrustment. To support his position, however, he points the Court to three cases in which this novel theory received some approval: *Big 3 Motors, Inc. v. Hawie*, 895 So. 2d 349 (Ala. Civ. App. 2004), *Jamison v. Pack*, Civ. A. No. 90-2308-JWL, 1992 WL 406527 (D. Kan. Dec. 11, 1992), and *Cotton v. Toole*, 359 S.E.2d 368 (Ga. Ct. App. 1987). A brief discussion of each of these cases is warranted.

*Big 3 Motors* arose from personal injuries occurring after Fred Roan, treasure of the defendant company, rear-ended Paul Hawie while driving a company vehicle. *Big 3 Motors*, 895 So. 2d at 350-51. It was undisputed that Roan was acting in his capacity as an officer of Big 3 Motors and had authority to drive the vehicle on the day of the accident. *Id.* at 350. It was also shown that Roan had eight prior convictions for driving under the influence ("DUI"). *Id.* at 351. At trial, judgment was returned against Roan, individually, and against Big 3 Motors. *Id.* On appeal, Big 3 Motors challenged the sufficiency of the evidence supporting the conviction and argued that there was no evidence "indicating that any officer or agent of the company entrusted the company vehicle to Roan . . . or that any officer or agent of the company knew that Roan was driving the vehicle on that day." *Id.* The court rejected this argument because "it was undisputed that Roan's duties as an officer and employee of the company included driving company vehicles when it was needed." *Id.* According to the court, it was "undeniable that

Roan, as an officer of the company, entrusted care of the vehicle to himself." *Id.* at 352.

In *Pack*, a number of individuals were injured or killed when their vehicle struck a piece of agriculture equipment pulled by Marvin Pack, who was driving a truck owned by P&H Oil Field Service, Inc. *Pack*, 1992 WL 406527, at *1. Pack had a "lengthy record of traffic violations . . . which the plaintiffs [argued was] sufficient evidence to indicate that Pack was an incompetent and reckless driver." *Id.* at *2. Pack was the president of P&H at the time of the accident. *Id.* Based on these facts, the plaintiffs brought a negligent entrustment claim against P&H, arguing that "Pack, acting as an officer of P&H, negligently entrusted the vehicle owned by P&H to himself. In other words, Pack, wearing his hat as an officer of P&H, negligently entrusted the vehicle on behalf of P&H to himself in his individual capacity." *Id.* P&H moved for summary judgment, arguing that a person could not negligently entrust a vehicle to himself. *Id.* Although the court granted the motion on other grounds (the court found that Pack lacked authority to use the vehicle), it rejected P&H's underlying argument that Pack could not negligently entrust to himself because "it ignores the fact that P&H (and Pack in his corporate capacity as an officer of P&H) is a separate entity from Pack as an individual." *Id.*

In *Cotton*, the plaintiff was injured when his car collided with another vehicle driven by John Toole. *Cotton*, 359 S.E.2d at 368. Toole was the president and owner of the Captain's Roost Seafood Restaurant, and the vehicle was owned by the business. *Id.* at 369. Evidence showed that Toole was drunk at the time of the accident. *Id.* The plaintiff brought suit against the restaurant on theories of respondeat superior and negligent entrustment. *Id.* The lower granted summary judgment to the restaurant on all claims and the plaintiff appealed. *Id.* at 368. On appeal, the court of appeals reversed summary judgment on the respondeat superior claim but affirmed dismissal of the cause of action for negligent entrustment. *Id.* at 369. Prior to affirming

11

dismissal, however, the court "[a]ssum[ed] without deciding that the corporate owner of [a] car might be held liable for negligent entrustment by [an officer], who, acting on behalf of the corporation, entrusted the car to himself[.]"  *Id.*  It dismissed the claim, however, because the plaintiff failed to produce any evidence showing that the restaurant "actually knew of [Toole's] state of intoxication at the time of the entrustment."  *Id.*  Additionally, there was no evidence "from which a pattern of reckless driving could be inferred."  *Id.*

Two broad principles can be drawn from these cases that inform an officer's ability to negligently entrust a company vehicle to himself.  First, the officer must have authority to operate company vehicles.  In *Big 3 Motors*, Fred Roan's "duties involved every aspect of the business, including driving company vehicles when necessary."  *Big 3 Motors*, 895 So. 2d at 350.  Likewise, in *Cotton*, John Toole's authority to drive the car was apparently presumed by the court as a result of his position as president of the business.  *Cotton*, 359 S.E.2d 369.  In *Pack*, however, the court ultimately concluded that the negligent entrustment claim failed because the plaintiffs "presented no evidence that the corporate entity P&H authorized Pack's use of the vehicle for personal matters."  *Pack*, 1992 WL 406527, at *2.  Second, where an officer has authority to use a vehicle, there must also be evidence from which the officer's incompetence or intoxication at the time of entrustment is known or should have been known.  In *Big 3 Motor*, evidence was introduced at trial that Fred Roan had eight prior DUI convictions, showing a history of incompetent driving.  *Big 3 Motors*, 895 So. 2d at 351.  The negligent entrustment claim failed on this element in *Cotton*, however.  There, the court found that "the record is devoid of any evidence that the entruster of the vehicle actually knew of [Toole's] state of intoxication at the time of the entrustment.  The record also contains no evidence (e.g., [Toole's] driving record) from which knowledge of a pattern of reckless driving could be

inferred." *Cotton*, 359 S.E.2d at 369.  Accordingly, without authority to use a company vehicle and without evidence that the officer's intoxication or other incompetence was known to the corporation, an officer of a company cannot negligently entrust a vehicle to himself.

In the present case, the record clearly demonstrates that Jamison, acting as Paducah Nissan's general manager, had authority to drive many of the dealership's inventory vehicles home overnight.  Paducah Nissan's majority owner, Richard Kelley, confirmed that Jamison was authorized to do so, and Jamison agreed.  (*See* Dep. Richard Kelley, DN 68-12, pp. 24:8-25:18, 60:17-24; Dep. Jamison Turney, DN 84-2, pp. 110:17-111:7.)  Accordingly, there is no genuine dispute that Jamison had authority to operate the motorcycle in this case.  Whether Paducah Nissan knew or should have known that Jamison was incompetent to operate the motorcycle is the more difficult inquiry, however.

To be clear, there is no evidence in the record that would demonstrate that Paducah Nissan knew that Jamison was intoxicated prior to operating the motorcycle on June 13, 2011. Liability for negligent entrustment will not attach in this case because one of Paducah Nissan's principals, Richard Kelley or Jim Meade, knew that Jamison was intoxicated at the time of entrustment.  There is simply no evidence in the record that would support this contention. Accordingly, the only way in which liability will attach is if Paducah Nissan knew or should have known that Jamison's abuse of alcohol rendered him incompetent to operate company vehicles on any occasion, not just the particular date of the accident.

Nothing in the record demonstrates that Richard Kelley or Jim Meade knew or should have known that Jamison abused alcohol in a way that rendered him incompetent to operate Paducah Nissan's vehicles.  Kelley testified that he saw Jamison drink on vacation but never to the extent that he would consider Jamison intoxicated.  (Dep. Richard Kelley, DN 84-3, pp.

13

47:19-48:14.)  Furthermore, he never saw Jamison drink and drive and never had anyone tell him, prior to the accident, that they witnessed Jamison drinking and driving.  (*Id.* at pp. 48:17-49:6.)  Likewise, Meade was not aware that Jamison had alcohol issues, had no knowledge as to whether others had observed Jamison drinking and driving and never personally observed Jamison drinking.  (Pl.'s Mot, DN 89-1, p. 9 (quoting Dep. James Meade, p. 39:9-24).)  To be sure, the testimony of other Paducah Nissan employees, like Mike Allen, shows that Jamison may have consumed alcohol on the job and may have operated Paducah Nissan vehicles after doing so.  Such testimony came from lower level employees over whom Jamison was a supervisor, however, and nothing in the record links these employees' knowledge to Kelley or Meade.

Because Bryant cannot show that Kelley or Meade knew of Jamison's alcohol abuses, he argues that Jamison's own knowledge of his drinking problems can be imputed to Paducah Nissan.  Under this reasoning, Jamison, vested with authority as general manager, knew that he, as an individual, abused alcohol and was rendered incompetent to drive dealership vehicles by that abuse.  In support of this position, Bryant once again relies on *Big 3 Motors*, *Pack*, and *Cotton*.  The Court declines to follow Bryant's position for three reasons.  First, *Big 3 Motors*, and *Pack* are distinguishable from the present case, and *Cotton* actually supports the contrary position.  Second, case law and agency principles have declined to impute an officer's knowledge of his own incompetency to the corporation.  Third, policy considerations counsel against imputing a corporation with knowledge of an officer's incompetency in situations, like the present case, where the incompetency is known only to the officer suffering from it.

Case law cited by Bryant does not support his argument that Jamison's knowledge of his own incompetence can be imputed to Paducah Nissan.  Although *Big 3 Motors* and *Pack* stand

14

for the proposition that an officer can negligently entrust a company vehicle to himself, the only evidence of incompetency in those cases was traffic violations available in the public record.  In *Big 3 Motors*, Fred Roan had eight prior DUI convictions.  *Big 3 Motors*, 895 So. 2d at 351.  In *Pack*, Marvin Pack had "a lengthy record of traffic violations, mostly for speeding[.]"  *Pack*, 1992 WL 406527, at *2.  Unlike the present case, knowledge of Roan and Pack's incompetence was in the public record and was or should have been known by the other principals of their companies.  In the present case, there is no record that Jamison had any DUI or other traffic violations prior to the accident that did or should have put Kelley and Meade on notice of his incompetency.  Finally, a close reading on *Cotton* supports the Court's position that an officer's knowledge of his own incompetence cannot be imputed to the corporation.  First, there is no record in *Cotton* that John Toole had prior DUI convictions or other traffic violations.  *Cotton*, 359 S.E.2d at 369-70 ("The record also contains no evidence (e.g., [Toole's] driving records) from which knowledge of a pattern of reckless driving could be inferred.")  He simply drove a company car following an afternoon of playing golf and consuming alcohol.  *Cotton*, 359 S.E.2d at 369.  He was killed when his vehicle struck the car driven by Larry Cotton.  *Id.*  Blood alcohol tests revealed that Toole was intoxicated at the time of the accident.  *Id.*  Despite this, the court affirmed dismissal of the negligent entrustment claims because the record was "devoid of any evidence that the entruster of the vehicle, [Toole,] actually knew of [Toole's] state of intoxication at the time of entrustment."  *Id.* at 369.  If knowledge of one's incompetency could be imputed to the corporation, the court would have likely held that Toole's knowledge of his intoxication could have been imputed to the company because he had gotten himself drunk.  The court did not do so.  In a similar way, the Court declines to impute Paducah Nissan with knowledge of Jamison's alcohol abuse when it was not known to the company's principals.

Other case law counsels against imputing a corporation with knowledge of an officer's incompetence known only to him.  In *Viau v. Fred Dean*, *Inc.*, Fred Dean, the president of Fred Dean, Inc. ("FDI"), drove a company vehicle while drunk and injured the plaintiffs.  *Viau v. Fred Dean, Inc.*, 418 S.E.2d 604, 605 (Ga. Ct. App. 1992).  The plaintiffs sued FDI on a number of theories, including negligent entrustment.  The Court of Appeals of Georgia found that FDI should have been granted summary judgment on that claim because "the *only* officer or agent of FDI who had *both* the actual knowledge of Dean's alleged incompetency *and* the power to entrust or withhold use of the FDI vehicle was Dean himself."  *Id.* at 607.  Although the court agreed that a corporation only acts through its officers and agents, "Dean's actual knowledge of his own alleged incompetency *cannot* be imputed to FDI" because "[h]is 'private interest in driving an automobile outweighed his duty as a representative of the corporation to ensure that an incompetent driver did not operate the corporation's automobile."  *Id.* (emphasis added) (quoting *Keenan v. Hill*, 378 S.E.2d 334 (1989)).[1]

Although not explicitly stated as such, the outcome in *Viau v. Fred Dean, Inc.*, resulted from an the application of the "adverse interest" exception found in agency law.  The general rule in Kentucky is that "[t]he knowledge of the agent is the knowledge of the corporation he serves when the knowledge relates to some matter over which the agent has control and with which his duties are connected and when they relate to matter over which he has authority; otherwise, not."  *Warfield Nat'l Gas v. Anderson*, 61 S.W.2d 7, 28 (Ky. 1933).  The "adverse interest" exception to the general rule states that "the agent's knowledge will *not* be imputed to his principal where the

---

[1] It should be noted that *Viau v. Fred Dean, Inc.*, was decided by the Court of Appeals of Georgia five years after it decided *Cotton*.  Although the *Cotton* Court held that there was no negligent entrustment because there was no record that the entruster of the vehicle, Toole, knew that he, as an individual, was intoxicated at the time of entrustment, a fair application of *Viau v. Fred Dean, Inc.*, to *Cotton* would imply that even if Toole knew he was intoxicated at the time of entrustment, his knowledge could not be imputed to the business because his personal interest in driving outweighed his obligations as a representative of the company.

agent is acting adversely to the interest of the principal." *FDIC v. Am. Sur. Co. of N.Y.*, 39 F. Supp. 551, 556 (W.D. Ky. 1941) (emphasis added).   Since the agent is acting adversely to the principal, it is presumed that "he would not communicate the fact of the controversy to his principal but would for that reason alone probably conceal the facts from the principal." *Id.*   The exception applies "where the agent acts for himself in his own interest and adversely to that of the principal."   *Hooker v. New Amsterdam Cas. Co.*, 33 F. Supp. 672, 674 (W.D. Ky. 1940). Applied to the present case, an agent with authority to operate company vehicles who is incompetent to do so by reason of a pattern of alcohol abuse not known to the principals, acts adversely to the interest of the principals when he exercises that authority.   His interest is clearly adverse to the principal because he creates liability by operating the vehicles while subject to an incompetency not known to them.   Accordingly, Jamison's knowledge of his own incompetency cannot be imputed to Paducah Nissan because he acted adversely to the company's interest by operating the motorcycle under an incompetency that was not known or knowable by the company's principals.

Finally, public policy considerations counsel against imputing Jamison's knowledge of his incompetency to Paducah Nissan in order to find that he negligently entrusted the motorcycle to himself.   Under the facts of the present case, an officer of the company appears to have suffered from an incompetency that rendered him incapable of operating company vehicles.   This incompetency was known only to the officer and low level employees and not to the principals. To impute Jamison's incompetency to Paducah Nissan under a theory of negligent entrustment would be to impute the principals with knowledge they did not and could not have known under the circumstances.   Such a rule would make companies liable for injuries caused by an officer's incompetent operation of a company vehicle when the underlying incompetence is known only

to the officer.  To hold a company liable for negligent entrustment in such circumstances would make the company an insurer of unknown incompetence.  Such a rule would be against public policy.

In conclusion, Paducah Nissan did not negligently entrust Jamison with the motorcycle because nothing in the record shows that the company's principals knew or should have known of the alleged pattern of alcohol abuse that rendered Jamison incompetent to operate company vehicles.  Furthermore, Jamison's knowledge of his own incompetence cannot be imputed to Paducah Nissan for all of the reasons outlined above.  Accordingly, Bryant's negligent entrustment claim based on Jamison's alleged pattern of alcohol abuse fails as a matter of law.

### b.

Although Jamison's alleged alcohol abuse will not form the basis of a viable negligent entrustment claim, Bryant also alleges that Paducah Nissan negligently entrusted Jamison because he was allowed to operate the motorcycle even though Richard Kelley knew Jamison was inexperienced with such vehicles.  Again, "one who entrusts her vehicle to another whom she knows to be inexperienced . . . is liable for the natural and probable consequences of the entrustment."  *Cox v. Waits*, 2004 WL 4055811, *2.

Bryant's argument regarding Jamison's inexperience centers on the deposition testimony of Mike Allen.  Allen testified that after Kira's death he, Richard Kelley, and another Paducah Nissan employee, Pat Wallace, had a meeting.  (Dep. Mike Allen, DN 90-3, pp.37:6-38:12.) During this meeting, Kelley recounted a conversation he had with Dedra in Florida during the week prior to the accident.  According to Allen, Kelley said that he had asked Dedra if Jamison had sold the motorcycle.  (*Id.* at p. 37:21-22.)  Dedra responded that Jamison still had the motorcycle and wanted to keep it because he liked to ride it.  (*Id.* at p. 37:24-25.)  In response to

18

Dedra's statement, Kelley told Allen that he said, "[Jamison] can't handle a motorcycle.   He doesn't know how to drive a manual transmission.   He doesn't have any business with a motorcycle." (*Id.* at p. 38:1:4.)   Based on these statements, Bryant claims Paducah Nissan negligently entrusted Jamison with the motorcycle because Kelley knew Jamison was too inexperienced to operate it safely.

At first blush, Allen's recitation of what Kelley said that he said to Dedra potentially involves multiple layers of hearsay.   At second glance, however, it is clear that the statements are not hearsay and are admissible as statements by an opposing party offered against that party as contemplated in Federal Rule of Evidence 801(d)(2).   Accordingly, the Court may properly consider Kelley's statements because there is no issue as to their admissibility.

Kelley's statements to Dedra raise a genuine dispute of material fact as to whether he knew that Jamison was unable to safely operate the motorcycle due to inexperience.   Because a genuine dispute exists, Paducah Nissan's motion for summary judgment on the claim of negligent entrustment must be denied.   Based on his own statements, Kelley may have entrusted the motorcycle to Jamison even though he knew Jamison did not have sufficient experience to operate it.   Bryant's motion for summary judgment on the same claim must also be denied.   He did not rely on Jamison's inexperience as grounds for summary judgment in his own motion. Rather, he first raised the issue of Jamison's inexperience in response to Paducah Nissan's motion for summary judgment.   (*See* Pl.'s Resp., DN 90, pp. 14-15.)   Accordingly, the Court finds that Kelley's statements regarding Jamison's inexperience are sufficient to raise a genuine dispute so as to preclude a grant of summary judgment to Paducah Nissan but are insufficient to warrant summary judgment on Bryant's behalf.   A genuine dispute remains as to whether Paducah Nissan negligently entrusted Jamison with the motorcycle as a result of his

inexperience.

## IV.

Relying on the theory of respondeat superior, Bryant alleges that Paducah Nissan is vicariously liable for Kira's death because Jamison was acting within the scope of his employment at the time of the accident.  Both parties seek summary judgment on this claim.

Under the doctrine of respondeat superior, an employer may be held liable for an employee's actions where it is shown that "the employee's actions were in the course and scope of his employment and in furtherance of the employer's business."  *Easterling v. Man-O-War Automotive, Inc.*, 223 S.W.3d 852 (Ky. Ct. App. 2007).  The doctrine is inapplicable, however, where "the employee engages on a 'personal and private trip' which has 'no connection with his masters' business.'"  *Id.* (quoting *Sharp v. Faulkner*, 166 S.W.2d 62, 63 (Ky. 1942)).  Accordingly, the issue in the present case is whether Jamison was acting within the scope of his employment at the time of Kira's death.  Based on a review of the record, the Court finds that a genuine dispute exists as to this issue, precluding the grant of summary judgment to either party.

For the purposes of respondeat superior, it is important to focus the scope of the employee's actions at issue.  In the present case, Paducah Nissan argues that Jamison was not operating within the scope of his employment at the time of the accident because he traveled away from home for purely personal reasons during the weekend prior to Kira's death.  Paducah Nissan has cast its net too wide and made the scope of its respondeat superior defense too broad in this regard.  The record clearly reflects that Jamison and his family used the motorcycle away from work and for personal reasons over the weekend of June 10, 2011.  However, just because Jamison used the motorcycle outside of the scope of his employment during the weekend does not mean that he was not acting within the scope of his employment at the time of the *particular*

20

motorcycle ride that resulted in Kira's death.  In order to determine whether Jamison was acting within the scope of his employment at the time of the accident, the underlying purpose of the motorcycle ride on the evening of July 13, 2011, must be examined.

The record reveals differing purposes for the motorcycle ride.  According to Jamison, he and Kira were going to the local Harley-Davidson store to look at a yellow motorcycle.  (Dep. Jamison Turney, DN 68-5, p. 73:13-16.)  Kira wanted him to replace the motorcycle they rode with a yellow one.  (*Id.*)  If true, Jamison operated the motorcycle for purely personal reasons that were neither within the scope of his employment nor in furtherance of Paducah Nissan's business.  As discussed above, however, in the course of investigating the accident, Dedra offered an alternative purpose for the motorcycle ride.  In an interview with law enforcement officials, Dedra stated that Jamison and Kira "went that way because [Jamison] was looking to upgrade the motor and [Kira] wanted to go look at motors that night.  So, they were going to the Harley store to look at motors."  (Aff. Jonathan Hampton, DN 68-13.)  The record shows that Jamison, through Paducah Nissan, previously purchased a custom seat for the motorcycle.  (Dep. Pat Wallace, DN 68-14, p. 21:5-25.)  Accordingly, Bryant argues that upgrading the motorcycle's motor was simply part of a continuing pattern of action whereby Jamison upgraded a vehicle in Paducah Nissan's inventory and was therefore acting within the scope of his employment on the night of the accident.  The Court finds that there is a genuine dispute of material fact as to whether Jamison was operating within the scope of his employment and for Paducah Nissan's benefit on the night of the accident.  Therefore, summary judgment may not be properly granted to either party.

## CONCLUSION

Plaintiff Richard Bryant and Defendant Paducah Nissan moved for summary judgment

on the issues of negligent entrustment and respondeat superior.  For all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the parties' motions filed at Docket Numbers 64, 68, and 89

are **DENIED**.